Next case on the call is Rector v. White Co. Coal. We have Mr. Marsico for the Appellant and Mr. Helmholtz for the Appellee. We've assigned 20, 25, and 5 to your arguments, counsel. So, Mr. Marsico, you may proceed when you're ready. Thank you very much, Ron. With me today is my partner, Mr. Gary Young, who's representing the defendants. In 1977, NUCO, Plaintiff's predecessors, entered into an agreement to assign to the defendants' predecessors, MAPCO, certain coal leases covering lands in White County. Under this 1977 agreement, MAPCO agreed to pay NUCO's overriding royalties on the coal mine under the leases that NUCO assigned to it, in return for which they would also pay an advanced $750,000 royalty, which was earned upon receipt, although future royalties would be credited against it. At the execution of that agreement, the 1977 agreement, NUCO assigned to MAPCO all of the White County leases it then had. In 1978-79, NUCO assigned additional leases it secured in White County, because under that 1977 agreement, they had one more year to see how many more leases they could get. From 1977 until the present, Your Honor, MAPCO's and its successors, the defendants, have paid NUCO and its partners over $8.5 million in overriding royalties. It's important to note that there is no claim in this action that one cent was not paid on the coal of the mine under the leases that NUCO assigned to MAPCO. This case involves NUCO's heirs' claims to overriding royalties on leases in White County that MAPCO's successors secured on their own over 20 years after the NUCO leases were assigned by NUCO to MAPCO. There is no claim, we contend, under the party's contract or long-established law of Illinois for overriding royalties on what are referred to as the replacement leases. In 1986, nine years after the agreement was signed, and again in 1994, MAPCO surrendered a number of its leases in White County and elsewhere as part of a company-wide cost-reduction program as a result of the vast sales of coal economy. These surrenders included NUCO leases, MAPCO leases, leases by other parties, and there is no evidence that there was any motivation on the part of MAPCO to pick leases that were specifically assigned to it by White County. Indeed, the plaintiff at trial stipulated that these surrenders were done, quote, for valid business reasons. At trial, the plaintiff's expert, now Judge Lackley, testified that these surrenders were done in, quote, good faith, and the lower court found that MAPCO, quote, acted with no motive to terminate the plaintiff's royalties when surrendering these leases. In 1996, MAPCO put its coal assets up for auction. Its management bought it out in LBO. They went public, earned some substantial cash, and decided to get back into the business of mining coal. After lengthy study and investigation and a considerable investment, they decided to bill a Petiti II on the west side of the Harold Phillips Town Fault and began securing NUCO leases, including leases for some of the areas that were covered by the old NUCO leases assigned 20 years before and which had been surrendered in good faith 5 and 13 years earlier. Plaintiff's claims in this action were for a low variety of royalties on these replacement leases. Your Honor, the lower court erred in awarding them in three respects. First, by holding that the plaintiffs had any right under the 1977 agreement to over $3.8 million in past royalties, as well as future royalties, on the replacement leases when the agreement between the parties simply does not provide for royalty on these leases. Second, it erred by holding that the plaintiffs were joint venture partners of the defendants, entitling them to these royalties, when the elements of a joint venture were never proven at trial and all the evidence shows that this was a routine commercial sale of leases. Thirdly, the lower court erred by holding that the plaintiffs were entitled to the royalties on a claim of unjust enrichment, when they had a fully negotiated contract that by law controls their relationship, under which they had no right to royalties. Is there anything in the agreement that the parties would share losses? None whatsoever. None whatsoever. The only provision for consideration in the agreement was the overriding royalties that were paid on the leases that were assigned by Newcoat to Mapco in fixed percentages, irrespective of the success of the business. The standard of review, Your Honor, is de novo for interpretation of the contract's terms, the claim of a joint venture and what the elements to it are, and the applicability of the law of unjust enrichment to a contractual relationship. The standard of review is whether the trial court's ruling is against the manifest weight of the evidence as to factual findings. Briefly on the breach of contract, Your Honor, as I've said, the agreement provides royalties only on coal mine under leases assigned to Newcoat prior to 1978, and the replacement leases were not secured by Newcoat at all, nor were they secured until 20 years after 1978. There's simply no provision in the 1977 agreement that creates a right to royalties on these replacement leases. It's a matter of simple contract. It was negotiated between sophisticated parties that were represented by a counselor. Really, Your Honor, the analysis could end there. However, this issue has arisen so often in the context of mineral rights that there's a body of contract law specific to mineral rights that reflects it. Because the mere holder of an overriding royalty interest has no interest in the minerals themselves and loses any right to a royalty with the termination of the assigned leases, because of that, some holders of ORIs have negotiated and paid for a contractual right to a royalty on the minerals themselves, whether they're mined under their leases, or extensions of those leases, or modifications of those leases, or even whole new leases. These provisions in the case law are variously referred to as royalty preservation clauses, extension or renewal clauses, compelling on water clauses, and indeed, anti-washout provisions. But by any means, Your Honors, the plaintiffs simply don't have one here. And in absence of such a provision, the plaintiff's right to override royalty is terminated with the good faith surrender of the leases that they assign. Am I correct that the defendants' expert agreed that the 1977 agreement has no language disclaiming a joint venture? That's right. And the defendants' geologist also confirmed a joint venture. Is that correct? No, sir, Your Honor. Your Honor, every piece of evidence to which the plaintiffs point in favor of it being a joint venture is equally consistent with a contractual relationship. When you have an ORI, you bet darn well you want that coal to get mined. ORIs and overriding royalties. I'm sorry, Your Honor. Royalty that comes from the mining of coal. Precisely. You bet darn well you want that company to do well. And you're going to be calling them saying, how's it going? How much royalties am I going to get next month? Well, let me show you what we're up to now. None of that proves a joint venture any more than it proves a contractual relationship. And the same can be said for the rest of the evidence to which they point. Now, with respect to the general rule that you need to have anti-washout language to preserve your rights in the face of a surrender, there is one exception. And that's where the leases are surrendered in bad faith. Under circumstances that the cases say show fraud or collusion. But we know there's none here as a matter of law. Because the plaintiffs stipulated that Mapco's surrender was done for valid business reasons. And its experts said it was done in good faith. And the lower court said that they acted with no motive to terminate the royalties. So again, the analysis should end here. But the lower court found, in the face of the uncontroverted fact that the 77 Agreement had no royalty preservation language, and the uncontroverted fact that Mapco did not surrender the leases in good faith, that the plaintiffs were entitled to royalties. And it did so by adopting the plaintiff's form of order almost verbatim, which held that the defendant's duty of good faith required that Alliance not exploit Newco's failure to insert an anti-washout provision, because Mapco knew or should have had acute knowledge of the consequences of such an error in judgment. Your Honor, this is unprecedented. The law says that an ORI, a vote-writing royalty, terminates with the estate from which it's parred, the assigned leases. Without some royalty preservation language, the plaintiffs cannot recover royalties on a poll that was not mined under the leases that they assigned. But the lower court said, yes, you can. Because good faith prevents the defendants from benefiting from there not being a royalty preservation clause. This is an American law. There is no such legal duty. There is no legal duty to pay royalties as though there is a royalty preservation clause when there is none. The law is, and always has been, that a royalty will expire on the termination of the transfer of mineral lease. The cases are Fry and Heenan, cited on page 27 of my brief. The law is that an overriding royalty is preserved from the lease assigned and not from the oil, gas, or minerals ultimately recovered from the premises. The law is that an overriding royalty is a qualification on that which is conveyed. Walter versus Ohio, page 28. Because the royalty is tied to and dependent upon the underlying lease, an ORI has no existence apart from the working interest, the mining interest, Heenan. In an effort to distinguish these longstanding cases, plaintiffs note their gas cases. But this court has long held that the body of law used to construe oil and gas agreements is applicable to pool agreements. Death law is the case at page 42 of our brief. And as recently as again in 2010, this court held that an argument based upon a distinction between the types of minerals involved is simply not relevant. IGC National Resources, cited at 42. And, Your Honor, as we note in our footnote, the states that have addressed this anti-washout question with respect to pool all confirm that it's the same as in the gas context. There's no legitimate reason for changing that rule in the pool context. Your Honor, as I'll note, that in Piamco v. Shell, the United States District Court for the Northern District of Illinois, applying Illinois law, affirmed by the Seventh Circuit held that this general rule regarding royalty preservation clauses in Illinois applies in the pool context. The court said, quote, ORIs are interests carved out of the leasehold estate and, as a matter of law, terminate with the termination of the lease. Absent express language to the contrary. That court went on to explain, thus, the issue in this case is whether the contract evidences an intent to override the legal principle that royalties end with the termination of the estate from which the interests are carved. I submit that that's the same question to the court today. In Piamco, the parties had negotiated an express anti-washout provision, and the court enforced it. Because there is no such provision here, and no bad faith, Piamco teaches that the opposite result is compelled here. Contrary to what the lower court found, the duty of good faith does not effectively comply with an anti-washout provision on the contract. It simply doesn't happen. To do so would eradicate the entire law of overriding royalties, and that they arise out of and limited to the underlying estate. The duty of good faith under these circumstances has been clearly defined. The leases can't be terminated in bad faith in an effort to deprive the royalty board of those royalties. Complaints were stipulated, and the court found that this did not occur. They were surrendered in good faith 9 and 17 years later, after they'd been assigned, and were only replaced 5 and 8 years after that. Your Honor, I'll pause to note that as an adjunct of stipulating that there was no bad faith in the surrenders, the plaintiffs argued that the bad faith occurred in 03, when Alliance failed to pay royalties when it began mining coal under the replacement leases. The problem with that analysis is, if you accept their stipulation that the surrender was in good faith, and that there was no language preserving these royalties, then the duty to pay royalties on the replacement leases was forever extinguished. There was then no duty in 03 to pay them that could be breached in bad faith. It did not exist. They did not have an obligation to do so. I'll note, in conclusion on the contract argument, that in 2008, the lower court got it right. This is a long case with a lot of history. And the court granted summary judgment on the contract claim, finding that, quote, the defendants had an express contractual right to release the new co-secured leases at issue for any reason. Once the defendants properly exercised that right, plaintiffs O-R-I, overriding royalty interest, terminate it as a matter of law. Plaintiffs cannot cite to any Illinois oil, gas, or mineral leasing case that holds to the contrary, close quote. Your Honor, we submit nothing has changed since that decision was granted. Briefly on the joint venture claims. This case was originally tried, and the trial court originally summarily dismissed the plaintiff's contract claim. It was revisited. There was no trial. It was on a motion for summary judgment, pre-trial. Was it the same judge? It was not. He was asked to reconsider. We then followed up with a motion for summary judgment on joint venture, and on Justice Richman, because they followed the contract claims as we contend now. They cross-moved for reconsideration, and the judge granted their motion for reconsideration, then denied our summary judgment on the unjust enrichment of the joint venture. The court's holding that the party had a joint venture is error. The construction of the contract is a matter of law for this court. If it finds it is unambiguous, the court must enforce it pursuant to its clear meaning. The 77 agreement, D-2 in the record, is unambiguous in this regard we submit. It's the sale of leases for $750,000 in advanced minimum royalties, and royalties going forward pursuant to its term, and nothing more. The proof is in the assignment. The assignment was to whom? Matco. When you contribute to a joint venture, you assign the assets to the joint venture. And Matco certainly was not a joint venture here. Look at the documents, Your Honor, if you have any doubt about it. There's not one word that suggests it's a joint venture. It's an arm's-length transaction with no future activities contemplated by the assigned partner other than the assignment and the right to secure accumulations for the following year. If you do go beyond the document, the evidence supports the same conclusion. Not one person testified that this was a joint venture. Mr. Rector himself said that the deal was to sell the prospect to Matco for Matco to develop. And after the sale, quote, we were completely out of the picture. Mr. Rector further testified, question, after you executed the 77 agreement, what was your function in regard to developing pool reserves? Answer, none. Is that what you mean? Question, yes. Answer, no. Question, Mr. Fowler, you stated earlier Matco took over the project as of January of 77. Is that correct? Answer, that's correct. This testimony was taken even before the joint venture claim was asserted in this case by way of an amendment long after these depositions were taken. Never before that amendment did anybody assert there was a joint venture here. Mr. Fowler, the lawyer party to the joint venture agreement, testified that he, as well as Plaintiff's expert, knew how to draft joint venture agreements. Didn't look like any of these, the way they described them. Your Honor, as time runs out, I'll note that there are five elements of a joint venture. We submit none of them were proven here. You begin with an intent expressed or implied to carry on a joint venture.  And a manifestation of that intent, none shown here. All that they did was consistent with two things, wanting to get as much royalty as they could and a few collateral contract arrangements by which Rector's other businesses did some billing activities, which Mr. Rector testified were paid for. The elements of the joint venture, each party held a proprietary interest in the subject matter, not so here. They were assigned outright to MAFCO, not to the joint venture. Each party had the right to operate the joint venture. No evidence of that here. MAFCO ran its own business and invested $150 million in these mines. Not one penny came from the plaintiffs. Share in the profits and losses, never happened. They got their royalties no matter what. Your Honor, we submit the law of Illinois under Yokel at page 47 is that all of these elements must be proven by clear and convincing evidence. They were not done so here. And finally, Your Honor, with respect to the unjust enrichment claims, the law is very clear. Where there's a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application. Take a look at the recitals to the agreement. It says, a 77 agreement, whereas the parties have heretofore entered into various agreements concerning whole properties in Wright County, which have been altered and amended. And whereas the parties desire to replace all the agreements and amendments thereto with this single document setting out the full and final rights concerning whole properties in White County, Illinois. Witness this agreement. That's the sole agreement of the parties with respect to the whole properties in White County, Illinois by the signed agreement of the parties. Thank you, Your Honor. Counsel, you have an opportunity to go to the rebuttal. Counselor? Thank you, Justice Weston. Justice Weston, I have permission to rebuttal. I may or may not. I object to that payment in writing, but if I, Justice Goldenberg, should possibly block his view, I will. May it please the Court, Justice Weston, Justice Welch, Justice Goldenberg, thank you as always for this discretionary opportunity to appear in front of you. Let me start out by just laying out some groundwork basics. The 1977 agreement is shorthand for a contract signed in January 1977. My clients are widows, heirs, successors, and assigns of partnership interests. Illinois General Partnership. There were three individual partners and one corporation in the partnership. Three individuals were Bill Rector, Sam Stone, and Jack Fowler. The fourth partner was Colonel Otis Parks. He was an exploration geologist. He put his interest in a corporation. That corporation was NUCO, Inc. The partnership is referred to as NUCO Partners. NUCO, Inc. acted for the partnership in every significant situation. Executed all the leases, executed the agreements. So I'm going to make those basic players clear. Now, these gentlemen combined drilling expertise, electric log evaluations for coal seam thickness. Colonel Parks was a vice president of exploration geology for a major international coal company. Jack Fowler had been in-house general counsel at AMAX and as well as at Oak Bend in southern Illinois. Colonel Parks knew how to test coal, figure out if it was electric utility quality. These gentlemen, Bill and Sam had sterling reputations in their community. They were able to go out and quickly identify the significant mineral owners and establish a critical mass of leasing. And the critical mass that they leased, let me walk over here, led to total control of 88,000 acre coal reserve. That had over 200 million tons of comfortable number 6 coal. This is what was given to MACCO in 1977. But that was just one point in a five-year transitioning relationship. Now, let me first start out with the contract issues in this case. And by the way, this contract is a living, breathing, executive contract. It continues to bind my clients to this day. Defendants are the ones who seek to avoid their express obligations under the contract. Now, defendants make three outcome determinative concessions in this case on the contract question. First of all, and I will read it, defendants, and I quote, agree that the 1977 agreement must be construed as a whole and that the same rules of construction and interpretation apply to the 1977 agreement as to other contracts. Now, this is a concession they must make. There are two clear Illinois Supreme Court cases that say we do not treat contracts involving minerals any differently than any other contract. Try to intrude rules of contract interpretation. Let me also make another very important fundamental point. This case does not involve an interpretation or dispute on any language in a mineral lease. This case does not involve any dispute over any language or interpretation of an assignment of mineral leases. This case concerns a contractual agreement. And Mr. Marsco said several times it was just an assignment of leases. It's just an assignment of leases. Here's my concern. Yes, sir. I think you argue that labeling plaintiff's share as royalties does not prevent finding that royalties equals sharing profits. Yes, sir. But there is no provision for sharing losses. Is that correct? That's correct. So you only get the profits and you don't have to pay for the losses. But can I explain myself? How is that a joint venture? There are five more cases we've cited in our brief where appellate courts in this state have said it's the sharing of profits that is significant. You do not have to share losses. And I assure you that's what those cases say. They are briefed and quoted. It is the sharing of profits that is essential. And the reason we say royalties are a sharing of profits is because the long run of Supreme Court cases make clear that joint venture theory is an equitable cause of action. It's not a law court cause of action. The chancellor in equity does things that law courts do not do. And so it's a flexible case. It is to be proved circumstantially. Everyone's intent is almost always to be proved circumstantially. No one's going to come in and say we undertook a joint venture. The contract in this case is an incident of a joint venture agreement. But the joint venture is an implied circumstantial. Every joint venture case you see will have incidental contracts, employment contracts, building leases, real estate. That is an incidental contract. Let me make sure I emphasize the concessions defendants make that are outcome determinative and cause them to lose on the contract issue. And when they stand here and tell you that this is just an assignment of leases, here's what they said in the briefs. And I quote, plaintiffs and defendants were parties to a complex commercial transaction that involved, among other things, the assignment of coal leases and the payment of overriding royalties. That's their language when they're not orally summarizing what they say. They know it's far, far more. And another thing you never heard from Mr. Marsika was the scope of review. I actually heard him say when Justice Waxman asked him about joint ventures, he said, well, none of that evidence proves a joint venture. He doesn't ask this court to re-weigh the evidence. Judge Overstreet heard seven days of testimony. He saw hundreds of exhibits, many experts. He found on the facts there is a joint venture. And we cite to you at least five cases on implied joint ventures that say that is really committed to the discretion of the trial court and we will not lightly substitute our judgment because an implied joint venture is so fact-intensive. But again, I want to stay with the contract before I really move into joint venture. And here's why defendants lose for the primary reason. Once they concede that contract law covers it, not minimum, contract. And by the way, these royalties are created in the contract. The typical, and they're royalties as a grievance, typically an overriding royalty is created by exception, reservation, in the reportable instrument that assigns the leasehold estate. Big parties did not do that. If you look at the assignment of leases, it says the opposite. It says this assignment, this plaintiff's certificate two is the first assignment. This assignment is made and given subject to the terms and conditions of the 1977 agreement. So the assignment is expressly made subordinate to the contract. That's where the royalties are created. And typically, they're created in an instrument. They did it differently. Now, this is the first rule of contracts. Contracts model one. We discern the party's intent by looking at the plain language of the agreement. There is not a single word in the contract authorizing termination of my client's royalties under any circumstance, under any scenario. And let me repeat that. There is not a single word in any instrument, the contract, the assignments, the leases that empower the coal company to get out of their contractual obligation to pay royalties. Now, how could the party's intent be any less clear? They didn't create royalties. They have no termination power. The second rule, fundamental rule of contract law, the four corners rule. This court's familiar with the rule. We look to all four corners of the contract to discern the party's intent. We look at all the language used. And then we try to gather from the full, complete document. When you look at this document, you will see that the party's used the following types of language. Coal properties, coal tracks, projected recoverable reserves, coal rights, acreage to which New Coast ORR will apply, and reserve area. And perhaps most importantly, area of interest. One of the evidential items that Mr. Marsico glossed over, that Judge Overstreet heard and saw, was that an area of interest is common in joint venture agreements. It's a typical method that joint ventures use to define a pot. Now, NUCCO also made representations of warranties in the contract. They represented and warranted that there were 38 million tons of recoverable coal. They represented that there were 100 million tons of recoverable coal in adjacent, in nearby areas. Now, you don't do that without knowing what's down there. And these gentlemen knew what they were doing. They were the equivalent of an outsourced major coal company. They had exploration, drilling, pouring, lab testing, PhD geologists, mining engineers. This was a full, this was a training team. And that's why MAPCO wanted to do business with them. MAPCO had no connections to Whiteham. MAPCO had an option. And when that option came to be exercised in 1977, MAPCO could have let them. They didn't have to exercise the option. We're going to infer all reasonable inferences in favor of this judgment. I know this court's familiar with that concept. And one of the inferences you can easily draw is that there was an equivalency given and bargained for and exchanged fully and finally in 1977. In that exchange, my clients were going to get 1.67% of the royalties. And MAPCO would get 98.33%. And that explains why we don't put capital in. We don't have to put capital in. And in fact, if you take a look at DITAS, D-I-T-I-S, which really I think is probably the Supreme Court's most eloquent decision on the implied joint venture. In the DITAS case, the court noted in the facts that DITAS came to this group with simply an idea. It was a post-World War II housing development. They put no money in the deal. He brought the idea, and then he had the contacts from government housing officials to get these houses built. The group then managed to shelve some documents, assign some shares, before DITAS was left out in the cold. The court said he earned an equitable proprietary interest, and that sufficed for the control element actually in that case. One of the complications that the public raises is what royalty rate applies going forward. How do you answer that? What royalty rate applies? Well, that's a great question. One-half, one-and-a-half, one? Well, this question is too complicated for anyone to evaluate. So we're going to be back here again. Well, let me put it this way. They spent $150,000 on a $550-hour account to come in and tell Judge Overstreet the rate should have been 1.6%. Our expert took one, one-and-a-half, and two-and-a-half, and added them up. The trouble with the royalty rate is there were three phases to the leasing. Each phase had a rate of 2.5, 1.5, 1. Our expert added them up 5.3. The only way to really do it, I'm not even sure you could really do it, because what happens if on June 29th you have 95% of the minerals leased? And then on July 3rd you lease the other 5%. Is that a two-and-a-half percent lease, or is it out one-and-a-half percent? Or do you prorate among the two groups? Our expert very reasonably justifiably said, here's how you do it. This is the fair way to do it. No one suggested otherwise. There was no testimony that that was not fair. Now, the extrinsic evidence in this case. Once you get out of the plain language of the contract, you can take total comfort by looking at the extrinsic evidence. Because, and here's where defense makes the third outcome-determinative concession. Several of their officers were MAPCO officers, so there's overlap. These people testified of their own personal knowledge that MAPCO did not intend to use lease surrenders to terminate contractual royalties. So we know what the parties intended. And our Jack Fowler testified that he did not create the lease surrender power to give MAPCO an opportunity to wash out their contractual royalties. So since we know, and Judge Overstreet knew on the record what the parties intended, who would draft the protective preservation clause or anti-washout clause? When you're dealing with people, you've just handed them 88,000 acres. These acres are controlled forever. And if you look at the contract, some of the most significant language, my clients gave a covenant not to compete. It uses the word forever. It says MAPCO shall forever quit the area of interest. MAPCO knew how strong they were in county. They knew how strong they were with their credentials. And so MAPCO couldn't beat them. They had to join them. If MAPCO didn't join them, MAPCO would not get in on this play. And they knew that Colonel Otis Parks, a retired vice president of exploration geology for a major international mining company, knew how to do this deal. And that's also why the partners will let him do it. Now, there are other rules of contract construction that the court in Leipzig is very familiar with. The only courts before are forfeitures. They will not enforce a forfeiture in the absence of clear and express language. Not only is there no clear and express language authorizing termination of royalties, there is no language at all. If they want judgment law to be brought in and used to rewrite this contract, they want you to rewrite and insert a royalty termination power into this contract. Now, even their witnesses testified. They acknowledged they had discretion whether to invoke the washout. That was admitted. They also acknowledged, which, come on, they must. This court has discretion to decide if that judge-made principle law fits here. And that's why Judge Overstreet heard substantial evidence to decide, does this oil and gas principle that derives from a bunch of 88-year assignments with an overriding royalty carved out in the lease assignment, does that have any pertinence or persuasive effect in this case, on this record, involving 200 million tons of a very thoroughly crafted agreement? So, again, there is really no basis. The only courts would not imply terms that conflict with express term. If you imply into this agreement a royalty washout power, you will have expressly overridden the party's expressed intent. You will have changed a mandatory, clear obligation to pay royalties into a conditional one. The agreement makes the obligation to pay royalties unconditional. We also briefly applied covenant of good faith in fair dealing. Here's the issue on that. Matco mandated business reasons to surrender the leases and save $10 an acre per year that was payable with a mineral number. That was a business judgment. But Matco did not exercise that power with an intent to terminate royalties, and this we know. But there is this doctrine of wrongful prevention, or this court has actually written opinion, citing our briefs, that uses the phrase excused condition preceded. What that case says is basically an estoppel. It says if a party procures the elimination of a condition preceded to its own obligation, we're not going to allow that. That's inequitable, it's unfair, it's unjust, and we won't read that in it. The implied covenant is a tool of interpretation. Illinois courts use it because they presume the parties wanted to contract. If these defendants have the right to wipe out royalties on 23 million tons of coal with values between $6 and $8 million in the future, there is a risk of an entire erasure of consideration of mutuality. This is precisely when the implied covenant comes into play. The implied covenant says if there is that broad of discretion, there is a risk and a threat the contract can be illusory. We don't think parties enter illusory agreements. We're going to condition that discretion, and we're going to condition it with a reasonableness aspect. These defendants, the only reason they took those money is to line their own pockets with it. They have no good faith reason for this, and I urge you to look at the pilot case, recent PIELET, and in that case there was a limited partnership where the limited partners were employees of a development firm. They were allowed to buy very cheaply interest in the real estate development, which was a TIF funded project. There was a clause in the partnership agreement that says if you leave our employment, we enforce you to sell back your parts. Well, they left at a time when there was no value and it didn't look very promising. Eight years later, because of interest rates, there were some junior TIF bonds that became payable. There were many millions of dollars on the table. Then the general partner said, I'm invoking the PIELT power. And the circuit court, much as Judge Oshet did at first, said, yeah, you know, the express language agreement, the general partner has authority to do that if you read the plain language. How about the Pell Court? The Pell Court said, that's not right. If they really thought that was a good faith reason, they would have done it when the people left. If it's to bind their loyalty to you. Now they're just invoking it to snatch the money. So that case, I think, is clearly on point here. Now, I would like to address the joint venture issue. We touched on it. The law governing implied joint ventures in Illinois is well established. There's a long line of Illinois Supreme Court cases. The fundamental concept is that it's flexible, it's equity jurisdiction, and it is to be determined on a case-by-case basis. There is no rigid, flexible rule because joint ventures can arise in a myriad of circumstances. And those circumstances are best left to the trier effect to determine. Equity jurisdiction is not law jurisdiction. And to the extent courts construe these principles more and more strictly, they are really disregarding the fundamental importance of Supreme Court decisions, in my view. Now, these cases discuss general characteristics of an implied joint venture, but there are several, including one Supreme Court case that says, the most important element in making determination is the intent of the parties themselves. And another Supreme Court decision says, an exact definition of a joint venture is implied. So this is where the court signals that these are to be determined on a case-by-case basis. And there are at least five cases cited in our brief that say, whether a joint venture exists is a question for the trier of fact, as it is in the best position to judge the credibility of witnesses. Judge Overstreet did a marvelous job. He heard the testimony, he heard a number of witnesses. He concluded from the evidence that there was overwhelming evidence that they attended after this joint venture. Finally, I just want to briefly mention our cross-appeal. And as I stand here, I have to confess, I am extremely reluctant to say anything negative or critical about Judge Overstreet. He heard seven long, grueling testimonies, several hundred exhibits. He really did his job. He found that they had breached the contract. He found that they breached the implied covenant of good faith and fair dealing. He found that they had breached the fiduciary duties owed among joint ventures. But he stopped on the one yard line. He stopped on the one yard line, and he listens to the siren song, which was, Judge, if you give us specific performance, just let us go back to the way it was. We'll start paying again. We will resume paying royalties as and when they come due. That was the wrong metric. The metric is just reasonable certainty, a reasonable probability. This is done by this court and courts in this district every day of the week, divorce cases or pension plans. In condemnation cases where you have to use the income approach, capitalized income in the future. Business cases, this is routinely done. There's really no dispute in the record. We did it exactly the way the defendants did it. We used their terminology, their methodology. Counting the number of tons in a royalty area, a reserve area, is child's play for these professional mining engineers. It's child's play. If they have the core data that shows how thick the seam is, and they have looked at the seam, and they can see where there are partings, they can calculate the exact number of clean, saleable tons that go in a railroad farm. In fact, it was agreed in this case by both sides that 4,500 tons per acre is the average recovery. And when you're talking about 27, 30 years of mining, then average recovery becomes pretty reliant. So our expert did that. Now, I can see that predicted future prices, it was more tricky, but these defendants, the evidence shows, sold most of their coal pursuant to committed long-term contracts, some as long as 28 years, and they have base price terms that have plus or minus 10% annual adjustments. So it's much, much easier to predict that. Our expert said that there was 23 million recoverable tons in the replacement leases, and that he did the proper evaluation, the proper assessment, and he concluded that he had two options to the trial court. One was a straight line pricing assumption, and the other was an annual 2% escalation. It was 5.9 million under the straight line, or 8.2 million. Thank you. Thank you. Thank you. Mr. Marks. Thank you, Judge. There's no sharing in the losses. The losses sharing is an essential element of joint venture, and we direct you to page 11 of our brief, where we set forth the distinctions between the cases they cite, intending that you don't need to be able to share the losses. Do you think Parish is distinguishable? We distinguish it in their briefs, I guess. They don't share in the profits either. They get a flat royalty whether we make money or not. They don't share in the profits. They get a royalty that's set, a precise number, and we win, lose, or draw on that. The leases were terminable because Mr. Fowler from NUCO, before they assigned them, negotiated them to have the express right of unilateral termination so that NUCO could get out from paying the minimum royalties required in the leases in the event they couldn't assign the leases and no one could mine the coal. They testified that when they transferred, they assigned those leases to MAFCO. They assigned them with that right of termination in it and that we stood in their shoes with respect to it. The deal was they were terminable, and the deal on the 77 agreement was that you only got coal in the leases, or the coal was mined under those leases. The deal was that. In this area of interest, Your Honors, there's nothing in the agreement that says they get a royalty on coal mined in the area of interest. The area of interest is meaningless to the royalty computation because it's only on the leases assigned. We're here because there is no royalty preservation clause in this case. We submit that we're not asking you to rewrite the contract, or if we were asking you to ignore an anti-washout provision that was in the contract, then we would be the ones asking you to rewrite it. They're asking you to rewrite the contract by reading one in where there isn't. There was no royalty to wipe out here, and it wasn't wiped out. Damages. We acknowledge that you can estimate future income, discount it, and award it as an element of damages. It's done all the time. But what was done here was better than that. The specific performance was right, wise on the Chancellor's part, whose discretion you all should defer to. They will get every cent for which they're entitled. Not one penny will be missed under this brilliant remedy. With respect to the anticipation of future revenues and their discounting, there's all sorts of assumptions that need to be made, which may be right or wrong, which may give them what they're entitled to, plus or minus a lot. 5.9 million to 8.2 million. How precise is that? Even their own expert, the brilliant man that I acknowledge he is, can't give you any specificity. But nevertheless, they have no injury to crow about here. This is not a situation like a future earnings in a personal injury case where if you don't let them discount future earnings, the present value and reward, they'll get nothing. That's not the case here. They say in their brief, you should not let the defendants be permitted to escape liability on the future royalties. To not let them have future royalties or immunize the defendant from liability. Nonsense. Nonsense. They're getting paid. If you affirm on liability and affirm on the judge's wise damage remedy, which is a future royalty, they'll get every cent they're entitled to and there'll be no forfeiture, no immunization, and we submit a better measure of damages. Thank you, Your Honor. Counsel. Mr. Justice, you said the damage was 25,000, but I ordained them over allowing me $500,000. Correct. That's correct. The circuit court's decision to force these folks to remain in an abusive relationship with defendants remaining in charge of royalty accounting is nothing short of cruel and unusual punishment. They say we'll get every cent we're committed to. They have already given two separate interrogatory answers reporting different coal prices. One interrogatory answer says X dollars a ton, another one says X plus 50 cents a ton. We are doomed to a perpetual accounting with these folks. They also put on testimony during the trial, they may not mine our coal in the future. There's water problems. That was not an expert. It was totally unverified. But here you have a veiled threat. Not only are they taking our money, they may make us fight for every ton in the future. The best way to resolve that is liquidate this, make it a lump sum judgment. There was ample reasonable evidence in the record to support that. And, you know, Judge Overstreet, he telegraphed his issue with this. And if you read the briefs, read the transcribed excerpts, it's a long show. And Justice Welch wrote, really, the controlling opinion in this case. In Cornstubble v. Ford Motor Company, Justice Welch wrote for the court, a civil architectural engineer cannot support a cause of action against an automobile manufacturer. Especially the automobile manufacturers, experts are all automotive mechanical engineers. And Justice Welch concluded in that case that since the trial court's only reliance for the judgment, and this was a bench trial, was the architectural civil engineer, there was not any evidence to support the judgment. And it left the automotive engineers of the defendants unrebutted on the record. And the only out Justice Welch wrote in that case was to say if the judge thought the expert lacked credibility, it wouldn't be unrebutted. He could reject it. Well, we know that's not the case at all. Here's what Judge Overstreet said about our expert, Mr. Fox, and their expert, Richardson. There is no doubt that when it comes to mineral cases, Mr. Fox is much more qualified, hands down. Richardson is qualified to testify regarding damages, but how helpful it's going to be in this case, I'm not sure. And quite frankly, I have my doubts after hearing what I've heard. And Judge Overstreet was referring to the voir dire of Mr. Richardson, which was withering. Defendants constitute one of the largest coal producers in the United States. They have a market capitalization in the neighborhood of $1 billion. You know if they will spend $150,000 to fight over a $100,000 item, you have a flavor of what we're in for if this is remanded. And we have to trust them to go forward. Now, issue delivery. I ask that we not lose sight of the tremendous accomplishments of these gentlemen. Do not be swayed by this claim that this is a simple handover by middlemen of leases. It is 180 degrees from there. This was a fabulous effort that has led to billions of dollars in coal sales in this county, untold thousands of miners being employed in the associated related jobs. Now, on behalf of my extended family clients, who, with the sad exception of Bill Rector and Sam Stone, passed away, these folks have all stood by me throughout what is now a six year ordeal. I urge this court to affirm the circuit court of defendant's liability, reject defendant's reliance on a mineral law principle that has no application and is always controlled by location. It's coined by the defendants. It's a phrase they use to tell their annual reports to shareholders. It's information that their engineering experts use. It means we're going to get the coal, even if we don't have it leased. And the evidence was overwhelming. It was even undisputed. When they want the coal, they get it. They snap their fingers because they're the area controller. They're the only buyer. So, please keep that in mind. Apply the familiar fundamental law of contracts and in the end of the case, the circuit court to vacate the specific performance award and enter the lump sum, additional lump sum, an amount, one of the two amounts that the expert gave the judge discretion to choose. He didn't say it was a range. He gave him two precise numbers using two different methodologies. The only difference was the pricing assumption. If you affirm, you will prevent an unwarranted seizure of these folks' well-deserved legacy, the legacy that their husbands and predecessors left them. And this legacy has already lined these defendants' pockets. You heard that we got $8 million. I think it comes out to $300,000 per family over 30 years. These guys have lined their pockets with $1.1 billion, $400 million in coal sales revenue out of this reserve. There's your differential. Thank you very much. Thank you both for your recent arguments, complicated case, and we will thank you for your advisement and we look forward to hearing from you.